IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD M. SEAMANS              :          CIVIL ACTION
                              :
v.                            :
                              :
TEMPLE UNIVERSITY             :          NO. 11-6774

MEMORANDUM

Dalzell, J.
                                        October 25, 2012

    Plaintiff Edward M. Seamans ("Seamans") sues defendant
Temple University ("Temple") for violations of the Fair Credit
Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b).  Temple filed a
motion for summary judgment.  As Temple's motion requires the
little construed intersection of the Higher Education Act, 20
U.S.C. § 1001 et seq., with the FCRA, we necessarily must write
at some length.

## I.    **Factual Background**

    The parties do not dispute that in 1989 Seamans
received a $1,180.00 Perkins student loan from Temple.  Stip.
Facts (docket entry # 13) ¶ 1.  Seamans stopped attending
Temple, Stip. Facts ¶ 2, and his first Perkins loan payment was
due on January 20, 1992, with a payment schedule of fourteen
quarterly payments of $90.00 and one final quarterly payment of
$40.71.  Stip. Facts ¶¶ 3-4.  Seamans did not make any payment
on January 20, 1992.  Stip. Facts ¶ 5.

In or about 2010, Seamans applied for financial aid from Drexel University, and Drexel told him it would not provide him with such aid until he paid the balance of his Perkins loan to Temple.  Def.'s Mot. Summ. J. ("Def.'s MSJ") (docket entry # 14) Undisputed Material Facts ("UMF") ¶ 8; Pl.'s Resp. (docket entry # 16) ¶ 8.  On April 28, 2011, Seamans paid his Perkins loan in full to Temple.  Stip Facts ¶ 6.  The loan was thus outstanding and unpaid for over twenty years.

On May 17 and May 20, 2011, Seamans disputed with TransUnion the reporting of the Temple Perkins loan on his credit file.  TransUnion notified Temple of the dispute.  Stip. Facts ¶¶ 7-8.  He wrote:

> Loan defaulted 1992.  Temple didn't report in a decade+, and charged off long ago.  I paid Temple on 4/30, they retroactively reported years of 120d late payments, but it had been co'd.  Nothing from Temple was on my report until I fully paid to close account.  Why does report show two years of late payments?

May 17, 2011 TransUnion Dispute, Def.'s MSJ, Ex. 10.  In responding to the May 17 and May 20 disputes, Temple verified the information it was reporting about the Perkins loan, Stip. Facts ¶ 9, and it did not modify that information.

Temple reported that "(a) Plaintiff had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins loan was paid in full; (b) the Account Status was reporting as 'Current; Paid or Paying as Agreed;' (c) the Balance was reporting as '$0;' (d) the High Balance was reporting as '$1180;' (e) the Terms was reporting as '120 Monthly $30;' (f) the Date Open was reporting as '10/1991;' and (g) the Date Closed was reporting as '04/2011.'" Def.'s Mot. UMF ¶ 16 (citing Ex. 6, Deposition of David Glezerman dated April 12, 2012 at 113:15-117:5, 123:11-124:9; Ex. 14, Deposition of Jane Sana dated April 30, 2012 at 23:2-29:3, 29:23-36:1, 41:3-41:21, 43:23-47:6, 49:15-58:18, 60:8-70:5; Ex. 15, Deposition of Shelly Hawkins dated April 19, 2012 at 17:5-18:12, 23:23-29:6; and Ex. 16, Plaintiff's Consumer Report dated May 21, 2011).

Seamans does not challenge the veracity of Temple's response. Instead, he avers that Temple failed to report the date of first delinquency for the loan and Temple does not in its motion for summary judgment or in its reply to Seamans's response dispute that contention.

On August 1, 2011, Seamans wrote TransUnion to dispute the reporting of the Temple University Perkins loan on his credit file. Stip. Facts ¶ 11. Seamans wrote:

3

> In 1989 I received a Perkins Loan while attending
> Temple University.  I defaulted on the loan and the
> loan went to collection.  No activity occurred on the
> account for some time, and the account eventually came
> off my credit reports for all three of the reporting
> agencies.  I recently began attending school again at
> Drexel University, and in order to qualify for
> financial aid, I had to settle the Perkins loan
> default.  I walked into Temple's billing department
> and paid $2009 dollars on the spot, receiving a letter
> on Temple University letterhead that the debt was
> settled.  Temple went on to *retroactively* report two
> years worth of 120-day late payments to the credit
> reporting agencies.  It is important to note than
> [sic] there was no reporting on this account to the
> credit bureaus for many years, and then suddenly *after*
> the debt was paid, Temple reported two years worth of
> later payments all at once.
>
> I previously disputed this online, and received a
> letter stating that the creditor has reviewed the
> account and wishes to make no further adjustments to
> my credit record.
>
> To put it plainly, I want the Temple University
> account removed from my credit report.  The account is
> closed, and well beyond the time limit imposed for the
> reporting of derogatory credit information.
> Therefore, it should not appear on my credit reports
> now.  I have been a good consumer for years now, and
> the Temple reporting instantly negatively impacted my
> Trans Union score by approximately 80 points.

Def.'s MSJ UMF ¶ 20; Pl.'s Resp. Counter-Statement of Material

Facts ("CSMF") ¶ 10.

TransUnion informed Temple of the complaint.  Stip.

Facts ¶ 12.  In response to that complaint, Temple modified

Seamans's account status from "current" to "closed".  It also

4

changed the payment rating from nothing to "6", and the MOP code from "01" to "05".  Temple further changed the Remarks Code from nothing to "CLOSED", the date of Account Information from "04-01-2011" to "08-08-2011", the Date Closed from "04-01-2011" to "04-30-2011", and the date of last payment from nothing to "04-28-2011."  Def.'s Mot. 6 (citing Stipulated Facts at ¶ 14; Ex. 6 at 113:15-117:5, 123:11-124:9, Ex. 14 at 23:2-29:3, 29:23-36:1, 41:3-41:21, 43;23-47:6, 49:15-58:18, 60:8-70:5; Ex. 15 at 17:5-18:12, 23:23-29:6, Ex. 20).  <u>See also</u> Stip. Facts ¶ 14.  On or about August 1, 2011, Seamans also lodged much the same dispute with Equifax, who informed Temple of the dispute.  Stip. Facts ¶16-17.  In response to the Equifax dispute, Temple modified the Account Status, Remarks Code, Date Verified, and Date Closed.  Stip. Facts ¶ 18.

Again, Seamans does not challenge the accuracy of Temple's statements.  He again notes, and Temple does not in its motion for summary judgment or reply contest, that Temple continued to fail to report the date of first delinquency, failed to report that the account was disputed, and failed to include a payment rating that would have advised the credit reporting agencies that the account was in collection.

The parties disagree on the timing of Temple's reporting of the defaulted 1989 Perkins loan to TransUnion and Equifax.  Temple maintains that it reported the debt consistently to the three consumer reporting agencies from when it arose until Seamans at last paid it over two decades after receiving Temple's loan.  Def.'s MSJ 16.  Temple points in support to the deposition testimony of one of its representatives.  In his deposition, David R. Glezerman, Temple University's Assistant Vice- President/Bursar, testified:

> Q:   Does Temple have its own set of procedures for how information should be reported to credit reporting agencies?
>
> A:   Again, in accordance with the Higher Education Act and the accompanying regulations, that we report on a monthly basis to three credit reporting agencies.

Def.'s MSJ, Exh. 6, 80:5-11.

Seamans contends that "Temple began reporting the account at issue to the CRAs Experian, Equifax and TransUnion on or after April 28, 2011."  Pl.'s Resp. to Temple's Statement of UMF ¶ 10.

This factual dispute, however, is not relevant to our determination of liability because Seamans does not argue that Temple's compliance with § 1681s-2(b) depended on the <u>date</u> on

which Temple reported the information, but instead depended on

the <u>nature</u> of the information Temple reported:

> Plaintiff is not disputing the fact that
> Temple was not reporting the account until
> after Plaintiff's [<u>sic</u>] paid off the loan.
> Plaintiff disputes [<u>sic</u>] clearly reflect
> that Plaintiff believed the account was far
> too old to be reporting any longer on his
> credit report, which speaks directly to the
> fact that Temple was misreporting the
> account status, date of first delinquency
> and payment history, which would have
> otherwise alerted the CRAs that the account
> should be aged off of Plaintiff's credit
> reports.

Pl.'s Resp. at 22.  Because the only issue on which Seamans and

Temple have a factual dispute -- the date on which Temple

reported the trade line (that is, the description of the

account) -- is not relevant to a determination of liability, the

only remaining disputes are legal in nature, and the case is

therefore ripe for summary judgment disposition.

## II.  <u>Analysis</u>

### A.   <u>Introduction</u>

As noted, Seamans sues under the FCRA, 15 U.S.C. §§

1681-1681x.  The FCRA imposes an obligation to investigate on

those who furnish information to credit reporting agencies

("furnishers") that gives rise to a private right of action

under § 1681s-2(b).  It also provides for civil liability through two provisions -- §§ 1681n and 1681*o* -- the former imposing civil liability for willful noncompliance and the latter for liability for negligence.  In evaluating Temple's motion for summary judgment, we will draw all reasonable inferences in favor of Seamans as the nonmoving party, and summary judgment will be appropriate only if he has failed to sustain an element of a claim of either a negligent or willful violation of FCRA § 1681s-2(b).

Seamans claims that Temple violated § 1681s-2(b) by erroneously reporting the account status code, the date of first delinquency, and the payment history profile for his account. Pl.'s Resp. CSMF ¶ 13.  Seamans further challenges the reasonableness of the procedures Temple used to investigate the dispute, Pl.'s Resp. 16.  Finally, he argues that Temple is liable under § 1681s-2(b) for failing to mark the account as disputed.  Pl.'s Resp., CSMF ¶ 33.  Seamans alleges that as a result of Temple's actions the trade line remained on his account after it should have aged off, negatively affecting his credit score.  Pl.'s Resp., CSMF ¶ 35.

As we discuss below, the HEA, 20 U.S.C. § 1001 et seq., applied to the loan, and because the HEA modifies the

statute of limitations established in the FCRA for reporting delinquent accounts, Temple properly continued to report the Perkins loan.  If the trade line should have been removed under § 1087cc(c)(3), it was the obligation of the consumer reporting agencies, and not of Temple, to remove it.  Seamans has failed to show a causal link between Temple's conduct and his claimed injury, and he has therefore failed to sustain a claim for a negligent violation of the FCRA.  Furthermore, because Temple reasonably relied upon the interpretation of the HEA's effect on the FCRA that we adopt today, Temple did not willfully violate the FCRA.

We also hold Temple's investigation was reasonable as a matter of law.  Furthermore, because Seamans's dispute was not <u>bona fide</u>, Temple will not be liable for failing to mark the account as he contends it should have.

### B.   <u>Standard of Review</u>

As is well-settled, the moving party on a motion for summary judgment bears the burden of proving that there is no genuine issue of material fact; that is, that "the non-movant has failed to establish one or more essential elements of its case."  <u>Connection Training Servs. v. City of Phila.</u>, 358 Fed.

9

Appx. 315, 318 (3d Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

If the moving party meets its burden, "the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial," id. (citing Celotex, 477 U.S. at 324).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

Of course, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).

### C.   Seamans's Dispute

The essence of Seamans's dispute with Equifax and TransUnion is that he believes the trade line for the Perkins loan he received in 1989 from Temple should not have appeared on

10

his credit report at all, and the injury he complains about is
the damage to his credit score that this trade line has
allegedly caused.  See Pl.'s Resp., CSMF ¶ 35.  In his
complaint, Seamans avers that "Defendant has been reporting
derogatory and inaccurate statements and information relating to
Plaintiff and Plaintiff's credit history to third partie [sic],"
and that "The inaccurate information includes, but is not
limited to, an account with Temple which is otherwise obsolete
for purposes of credit reporting."  Compl. ¶¶ 6-7.  With the
exception of Temple's failure to note the fact of the dispute on
the trade line, which we will address below, the inaccuracies
Seamans cites all concern the presence of the trade line on his
credit report.

     As Seamans explains in his response to Temple's
motion, "what Plaintiff is actually disputing" is that "Temple
was misreporting the account status, date of first delinquency
and payment history, which would have otherwise alerted the CRAs
that the account should be aged off of Plaintiff's credit
reports."  Pl.'s Resp. at 22 (emphasis added).  The gist of his
claim is that the decades-tardy payments on his Perkins loan
should not have been listed on his credit report at all.
Seamans confirmed this interpretation in his August 1, 2011

letters to TransUnion and Equifax.  In the letters -- which are much the same -- Seamans wrote:

> To put it plainly, I want the Temple University account removed from my credit report.  The account is closed, and well beyond the time limit imposed for the reporting of derogatory credit information. Therefore, it should not appear on my credit reports now.  I have been a good consumer for years now, and the Temple reporting instantly negatively impacted my [credit] score.

August 1, 2011 Letter from Plaintiff to Equifax, Def.'s MSJ Ex. 22.  See also August 1, 2011 Letter from Plaintiff to TransUnion, Def.'s MSJ Ex. 22.

In his response to Temple's motion, Seamans elaborates on the details of the dispute by stating that, "[a]t the time the dispute was waged, Temple was erroneously reporting three key items of information related to the account status and payment history".  Pl.'s Resp. CSMF ¶ 13.  Those were the account status code, the date of first delinquency, and the payment history profile.  Id.

As Seamans explains, the essence of each dispute is that he believes that if Temple had reported the information accurately the trade line would no longer have appeared on his credit report.  With regard to the account status code, Seamans

contends that by reporting the account status as "current" rather than paid in full, Temple "disguise[ed] the fact that the provision of Higher Education Act would not apply to the loan and that the account should be aged off of Plaintiff's credit report consistent with FCRA restrictions." Id. ¶ 13. Similarly, Seamans stresses that the date of first delinquency should have been included in Temple's reporting because "this date is critical in establishing when the account should no longer be reported by a CRA." Id. ¶ 13.[1] Finally, Seamans objects to Temple's reporting of the account status code because -- so his argument goes -- if Temple had reported the code correctly it would have "alerted the CRAs that the account should be aged off of Plaintiff's credit report." Pl.'s Resp. 22.

> **D.    The Perkins Loan Trade Line:**
> **The Effect Of The Higher Education**
> **Act On The Fair Credit Reporting Act**

The FCRA provides a limitations period after which consumer reporting agencies cannot report derogatory information. Under 15 U.S.C. § 1681c, consumer reporting

---

[1] Plaintiff also notes that "Reporting the date of first delinquency is also specifically required by the FCRA," citing 1681s-2(a)(5)(A). Id. ¶ 18. As we discuss below, failure to comply with 1681s-2(a) does not give rise to a private right of action.

agencies may not report "[a]ccounts placed for collection or charged to profit and loss which antedate the report by more than seven years," § 1681c(a)(4), or "[a]ny other adverse item of information . . . which antedates the report by more than seven years," § 1681c(a)(5).

The HEA creates an express exception to this limitations period.  Under the HEA, institutions of higher education may enter into agreements with credit reporting agencies for the purpose of reporting on student loan borrowing activity.  The statute mandates that such agreements "shall provide for the disclosure" by the institution of higher education to consumer reporting agencies of "information concerning the repayment and collection of an [loan held by the institution], including information concerning the status of such loan."  20 U.S.C. § 1087cc(c)(2)(B).  The HEA explicitly exempts this reporting from the FCRA's limitations period: "Notwithstanding paragraphs (4) and (5) of subsection (a) of section 1681c of Title 15, a consumer reporting agency may make a report containing information received from the Secretary or an institution regarding the status of a borrower's account on a loan made under this part until the loan is paid in full."  HEA § 1087cc(c)(3) (emphasis added).

14

Under § 1681c(c)(1), the seven-year period for the loans Section 1681c(a)(4) describes begins 180 days after the date of delinquency that preceded the collection action. Calculating the date on which the seven-year period for "adverse item[s] of information" begins is simpler: it starts on the date the item arises.  Though our Court of Appeals has never opined on how to calculate the seven-year period under § 1681c(a)(5), the statute is clear on its face: unlike its treatment of § 1681c(a)(4), the FCRA provides no alternative method for calculating § 1681c(a)(5)'s seven year period, and calculating the period from the date the information arose is logical because each item of information arises on a discrete date. See, e.g., Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.")  Because the statute is clear on its face (and does not suggest an alternative method of calculating the time period), we find that the period begins when the item of information occurs.

15

The distinction between § 1681c(a)(4) and § 1681c(a)(5) is crucial here because if Seamans's Perkins loan is an "[a]ccount[] placed for collection" under § 1681c(a)(4), then the seven year limitations period would begin 180 days after the date of delinquency, which would be February 4, 1992, Pl.'s Resp. 23, and the trade line would properly be removed from Seamans's credit report.  But if information about Seamans's Perkins loan (that Temple reported to credit reporting agencies through 2011 pursuant to § 1087cc(c)(2)(B)) is "adverse information" under § 1681c(a)(5), then it would properly remain on the credit report until seven years after the last item of adverse information was reported -- which would have been April of 2011.  Def.'s MSJ, Ex. 6, 19:7-10.[2]

Seamans argues that the loan is an account placed in collection under § 1681c(a)(4).  The parties agree that "[s]everal times in the course of the life of the Perkins loan, Temple retained third-party collection agencies to attempt to obtain collection of the loan."  Def.'s MSJ, UMF ¶ 6.  Temple

[2]The HEA also allows a third interpretation according to which the information would be adverse information until the loan was paid in full at which time § 1087cc(c)(3) obliges a CRA to stop "mak[ing] a report containing information received from the Secretary or an institution regarding the status of a borrower's account."  But most important here, this reading only affects the reporting requirements for consumer reporting agencies and does <u>not</u> affect the question of Temple's liability.

16

contends, however, that "the express intention of 20 U.S.C. §1087cc(c)(3) [is to] exempt[] Perkins loans from th[e § 1681c (a)(4)] restriction."  Def.'s MSJ 13, n.3.  Temple maintains that "[u]pon final payment, the account is no longer in collection and is not retroactively subjected to 15 U.S.C. § 1681c(a)(4)."  Id.

Because the HEA's clear purpose as it relates to the FCRA is to exempt federally-backed education loans from the strictures of §§ 1681c(a)(4) and 1681c(a)(5), we agree that the loan is not subject to § 1681c(a)(4).  Temple reported the presence of the trade line and the negative payment history regularly, in compliance with HEA §1087cc(c)(3).  Under § 1087cc (c)(3), this reporting ceases when the loan is paid in full.[3]

The Senate Committee Report regarding the HEA leaves no doubt that Congress intended the HEA to provide an exception to the FCRA for reporting relating to federally-backed education loans:

> The committee has included a provision to
> clarify an institution of higher educations
> [sic] role in reporting information on
> Perkins loans to credit bureaus, the
> information to be reported on a loan on an

---

[3] It is possible that under § 1087cc(c)(3) the Consumer Reporting Agencies should have stopped reporting the information after Seaman's loan was paid in full, but this is, as noted in the preceding footnote, of no moment to Temple's liability.

ongoing basis, and the required frequency of
reporting. Further, S. 1882 makes changes to
section 463(c) of the Higher Education Act
to eliminate the prohibition on reporting on
the status of a borrowers account,
specifically negative credit information on
defaulted Perkins loans, beyond 7 years, and
requires instead, that information be
reported until the loan is paid in full.
These changes represent a simplification
effort and provide consistency between the
statute of limitations for collecting loans
and the period for reporting negative credit
information. The committee believes that
reporting of defaulted loans to credit
bureaus is an effective tool and should be
available to institutions and the Secretary
of Education for the entire period that loan
collection is allowed.

S. Rep. No. 105-181, at 45 (1998) (emphasis added).  Other

statutes confirm Congress's intent to enable longer reporting on

defaulted federally-backed education loans than on other forms

of debt.  For example, 20 U.S.C. § 1080a(f) provides for a

longer reporting period than would otherwise apply under the

FCRA for information regarding Family Federal Education Loans.

See 20 U.S.C. § 1080a(f).

Thus, Temple properly reported the presence of the

loan and the payment history pursuant to HEA §1087cc(c)(3).

When the account was fully paid, triggering the end of reporting

under §1087cc(c)(3), either the negative payment history became

18

adverse information,[4] (which will age off of Seamans's account in accordance with § 1681c(a)(5)) or a CRA should have removed the information in accordance with § 1087cc(c)(3).  We need not resolve which outcome the HEA mandates in order to resolve this dispute.

Plaintiff contends, without support, that

> The [HEA] unambiguously creates a limited exemption to the reporting requirements placed upon CRAs under FCRA Section 1681c(a)(4)-(5).  The requirements of FCRA Section 1681c(a)(4)-(5) do not apply to furnishers of credit information such as Temple.  Accordingly, Section 1087cc(c)(3) of the Higher Education Act could not impact Temple's obligation to comply with the FCRA Section 1681s-2(b) to conduct a reasonable investigation

Pl.'s Resp. 32.  This argument misapprehends the HEA's role in negating Seamans's claim.

The essence of Seamans's dispute is that the Perkins loan trade line should not be on his credit report because it

---

[4] Courts have found "adverse information" to mean "information which may have, or may reasonably be expected to have, an unfavorable bearing on a consumer's eligibility or qualifications for credit, insurance, employment, or other benefit." Serrano v. Sterling Testing Systems, Inc., 557 F. Supp. 2d 688, 692 (E.D. Pa. 2008) (quoting In re Miller, 335 B.R. 335, 346 (Bkrtcy. E.D. Pa. 2005).  Seamans's payment history is adverse information under this definition.  As Seamans says, "[T]he reporting of the Temple University account is causing nearly a 100 point drop in Plaintiff's score." Pl.'s Resp. 15.

should have "aged off."  Because the HEA applies to the loan,
Temple was correct in reporting the trade line and information
about Seamans's payment history.  Thus, even if the CRAs should
have removed the trade line and payment history from Seamans's
credit report, Seamans has failed to show a causal link between
Temple's conduct and his injury.  He has thus failed to sustain
a claim for a negligent violation of the FCRA, as we discuss
further below.

###     E.    Negligent Noncompliance With The FCRA

FCRA § 1681*o* provides civil liability for negligent
noncompliance within the statute's coverage.  Though our Court
of Appeals has not outlined the standard for negligent
noncompliance in the context of a furnisher's duty to
investigate under § 1681s-2, it has explained that in the
context of a credit reporting agency's duty to investigate under
§ 1681i, negligent noncompliance includes four elements: "(1)
inaccurate information was included in a consumer's credit
report; (2) the inaccuracy was due to defendant's failure to
follow reasonable procedures to assure maximum possible
accuracy; (3) the consumer suffered injury; and (4) the
consumer's injury was caused by the inclusion of the inaccurate

20

entry." Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir. 1996); see also Cortez v. Trans Union, LLC, 617 F.3d 688, 708 (3d Cir. 2010) (applying the Philbin test).

Though the FCRA may demand that credit reporting agencies conduct a more searching investigation than that required of furnishers, see Farren v. RJM Acquisition Funding, LLC, 2005 WL 1799413 at *7 (E.D. Pa. 2005), the Philbin test for negligent noncompliance is nonetheless useful in determining whether a plaintiff has stated a cause of action against a furnisher for noncompliance with § 1681s-2(b). This is because § 1681i and § 1681s-2(b) serve a similar aim of reducing the harm inaccurate reporting of credit information causes consumers, see SimmsParris v. Countrywide Financial Corp., 652 F.3d 355, 357 (3d Cir. 2011) ("The FCRA is intended 'to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner,'" (quoting Cortex v. Trans Union, LLC, 617 F.3d 688, 706 (3d Cir. 2010) and to that end, "The FCRA places certain duties on those who furnish information to consumer reporting agencies"). Secondly, the Philbin test hews closely to the common law understanding that negligence

21

liability requires a showing of causation.  See, e.g.,
Restatement (Second) of Torts § 281 (1965) (one element of a
cause of action for negligence is that "the actor's conduct is a
legal cause of the invasion").  Cf. Safeco Ins. Co. of America
v. Burr, 551 U.S. 47, 68-69 (2007) (applying common law tort
principles, as expressed through Prosser and Keeton and the
Restatement of Torts, in interpreting § 1681n, the FCRA's
willfulness provision).

Applying the Philbin test here, Seamans has failed to
sustain a claim for a negligent violation of the FCRA.  This
stems from his failure to show that any negligent failure to
investigate on Temple's part has caused the harm he complains of
-- the presence of the defaulted Perkins loan on his credit
report.  See Pl.'s Resp. CSMF ¶ 35 ("As can be seen from a
comparison of Plaintiff's credit scores, the reporting of the
Temple University account is causing nearly a 100 point drop in
Plaintiff's score").  Seamans alleges that Temple violated the
FCRA by "misreporting the account status, date of first
delinquency and payment history, which would have otherwise
alerted the CRAs that the account should be aged off of
Plaintiff's credit reports."  Pl.'s Resp. 22.  But even if
Temple had correctly reported that information as Seamans

contends it should have (that is, even if it had (a) reported an account status as paid and the debt as having been in collection, (b) reported the date of first delinquency, and (c) noted that the account was disputed), the account would have remained on Seamans's credit report beyond the FCRA's seven-year limitations period because the HEA exempts student loans -- such as this one -- from the limitations period of § 1681c(a)(4) and (5), and instead allows furnishers to report on the status of such loans until they are paid in full.

Plaintiff has not claimed that his credit score would have improved if the trade line had remained on his credit report, but with the additional information he seeks.  Instead, he repeatedly states that Temple erred in its reporting of the account status, date of first delinquency, and payment history because it reported these items in a way that "prevent[ed] the delinquent loan from being aged off by the CRAs pursuant to FCRA section 1681c(a)(4)", Id. 22-23.  This contention errs as a matter of law.

Though Seamans points out that § 1681s-2(a)(5)(A) requires furnishers to provide the date of first delinquency, and though the Higher Education Act requires furnishers to report to credit reporting agencies on the collection of loans,

20 U.S.C. § 1087cc(c)(2)(B), neither provision creates a private right of action.  See SimmsParris, 652 F.3d at 358 (FCRA civil liability provisions "cannot be used by a private individual to assert a claim for a violation of § 1681s-2(a), as such claims are available only to the Government"); Williams v. National School of Health Technology, Inc., 836 F. Supp. 273, 278 (E.D. Pa. 1993) (the HEA does not afford a private cause of action). Thus, if Temple had failed to supply the information those provisions require, such a failure would not support Seamans's claim.

### F.   Willful Noncompliance With The FCRA

The Supreme Court has held that liability for willful violations under § 1681n will lie not only in the case of knowing violations of the statute but also if a defendant acts with "reckless disregard" of the statute's terms.  Safeco, 551 U.S. at 69.  The Court defined such reckless disregard as,

> [A] company subject to the FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

Id.

24

Here, it is undisputed that Temple relied on its understanding of the HEA's effect on the FCRA that we describe above and which we adopt today.  See Apr. 19, 2012 Dep. of Shelly Hawkins, Def.'s MSJ Ex. 15, at 28:18 – 29:6; Apr. 12. 2012 Dep.  of David Glezerman, Def.'s MSJ Ex. 6, at 114:6 – 116:1).  In such a context, far from "[running] a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless," Temple applied a reasonable understanding of the statutory terms in its effort to comply with both the FCRA and the HEA.  This careful construction of the two statutes informed both its reporting to the credit reporting agencies and its investigation upon notice of dispute.  Temple thus committed no willful violation of the FCRA.

### G.   **The Reasonableness Of Temple's Investigation**

Because we find that Seamans has failed to show a causal link between any failure of Temple to investigate and his injuries, and because we find that Temple has not engaged in a willful violation of the FCRA, Seamans has failed to make a case for relief under the FCRA.

In the alternative, we find that Temple's investigation and its reporting in light of that investigation were reasonable as a matter of law.

FCRA § 1681s-2(b), the only ground on which one can bring a claim against a furnisher under the FRCA, provides:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall –
>
> (A)  conduct an investigation with respect to the disputed information;
> (B)  review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> (C)  report the results of the investigation to the consumer reporting agency;
> (D)  if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E)  if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the

26

> results of the reinvestigation
> promptly –
>   (i) modify that item of
>   information;
>   (ii) delete that item of
>   information; or
>   (iii) permanently block the
>   reporting of that item of
>   information.

§ 1681s-2(b)(1).  The statute does not define the extent of the investigation § 1681s-2(b)(1)(A) requires, and our Court of Appeals has not directly addressed the question.  But other courts have held that § 1681s-2(b) requires a <u>reasonable</u> investigation.  <u>See, e.g.</u>, <u>Johnson v. MBNA America Bank, NA</u>, 357 F.3d 426, 431 (4th Cir. 2004) ("§ 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified.");  <u>Van Veen v. Equifax Information</u>, 844 F. Supp. 2d 599, 605 (E.D. Pa. 2012) (relying on <u>Johnson</u>); <u>Krajewski v. American Honda Finance Corp.</u>, 557 F. Supp. 2d 596, 609 (E. D. Pa. 2008) (same).

In determining whether an investigation was reasonable, courts have balanced the burden on the furnisher against the danger of reporting inaccurate information.  <u>See, e.g.</u>, <u>Johnson</u>, 357 F.3d at 432 (endorsing "the general balancing

test . . . weighing the cost of verifying disputed information against the possible harm to the consumer"). Though questions of reasonableness are typically reserved for the jury, <u>Cushman v. Trans Union Corp.</u>, 115 F.3d 220, 227 (3d Cir. 1997), summary judgment is warranted where "the reasonableness or unreasonableness of the procedures is beyond question." <u>Crabill v. Trans Union, L.L.C.</u>, 259 F.3d 662, 664 (7th Cir. 2001). <u>See also</u> <u>Farren v. RJM Acquisition Funding, LLC</u>, 2005 WL 1799413, at *4 (E.D. Pa. 2005) (citing <u>Crabill</u> for this proposition).

A consumer's dispute determines the scope of the investigation a furnisher must conduct. <u>See, e.g.</u>, <u>Krajewski</u>, 557 F. Supp. 2d at 610 ("Whether a reinvestigation . . . is reasonable thus depends in large part on the allegations made by the consumer and the notice of the allegations provided to the furnisher by the consumer reporting agency."); <u>Farren</u>, at *7 (§ 1681s-2(b) does not require "any data furnisher to take extraordinary means to investigate and <u>discover</u> disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records.") (emphasis in original); <u>Chiang v. Verizon New England Inc.</u>, 595 F.3d 26, 38 (1st Cir. 2010) (quotation omitted) (the

28

furnisher's investigation should be judged "in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."). Thus, where the dispute does not involve "allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records." Krajewski, 557 F. Supp. 2d at 609 (relying on Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005).

As rehearsed above, Seamans's dispute is that the trade line should not be on his credit report at all. As he wrote in his August 1 dispute letter, "To put it plainly, I want the Temple University account removed from my credit report." Def.'s MSJ UMF ¶ 27. Equifax's notice to Temple translated this complaint as "DISPUTES CURRENT/PREVIOUS ACCOUNT STATUS/PAYMENT HISTORY PROFILE/PAYMENT RATING VERIFY PAYMENT HISTORY PROFILE, ACCOUNT STATUS, AND PAYMENT RAT", Aug. 8, 2011 Automated Consumer Dispute Verification, Pl.'s Resp. Ex. O.

Seamans's argument that Temple failed to comply with § 1681s-2(b) consists of two parts: (1) Seamans challenges the process Temple uses to respond to such disputes, see Pl.'s Resp. 15-20, and (2) he contends that Temple failed to provide

information required by industry practice and § 1681s-2(a).

Specifically, he argues that Temple misreported the "account

status, date of first delinquency and payment history."  Pl.'s

Resp. 22.  We address these arguments in turn.

### 1.   Temple's Procedure For Investigation

Seamans's dispute did not involve allegations of

fraud, identity theft, or any other complaint external to the

record, and so the scope of the inquiry was properly limited to

the record itself.  See Westra, 409 F.3d at 827.  In responding

to the dispute, Temple's vendor, ACS, investigated its records

using its standard procedure whereby ACS identifies the account

in the system through the borrower's number, confirms the

identifying information, consults eOSCAR to identify the reason

for the dispute, and reviews the account activity to determine

whether any of the information the consumer disputes is

inaccurate.  Dep. of Jane Sana, Def.'s MSJ Exh. 14.  ACS

concluded that the trade line and payment history were properly

included on Seaman's report.  Def.'s MSJ 19.

Seamans dismisses this ACS investigation as mere

"'processing' that Temple pays ACS for," and "nothing close to

an investigation."  Pl.'s Resp. 16.  But courts considering

similar procedures have found them to be reasonable as a matter
of law.  In Farren, the Court considered a "five-step procedure"
in which employees of a data furnisher would "perform an
investigation of disputed information, [] review all relevant
information provided by the consumer reporting agency, [] report
the results of the investigation to the agency, and [] report
erroneous information."  Farren, at *7.  Judge Pratter found the
procedure to be reasonable as a matter of law.  Id.  See also
Westra, 409 F.3d at 827 (finding a similar process reasonable as
a matter of law).

        Though in Farren the furnisher's employees performed
the work and here Temple outsources it, Seamans has failed to
explain the legal significance of that distinction.  None is
evident to us.  We hold that the process Temple used here was a
reasonable investigation in light of Seamans's dispute.

        **2.   The Information In Temple's Report**

        The thrust of Seamans's complaint is that Temple
"responded to his properly lodged credit reporting disputes by
supplying incomplete and inaccurate information about him to
TransUnion and Equifax," Pl.'s Resp. 30, because of the manner

in which it reported or failed to report the "account status, date of first delinquency and payment history." Id. 22.

Furnishers' obligations to provide accurate information under §§ 1681s-2(b)(1)(D) and (E) arise only after a reasonable investigation has revealed that the disputed information is inaccurate. See Krajewski v. American Honda Finance Corp., 557 F. Supp. 2d 596, 609 (E.D. Pa. 2008) ("With respect to the accuracy of information in a credit report, a furnisher of information has a duty enforceable through a private right of action only after conducting an investigation in which it finds the disputed information to be inaccurate or incomplete."). Thus, unlike § 1681s-2(a), § 1681s-2(b) does not impose a duty to provide accurate information outside of the investigation process.

Though our Court of Appeals has not defined accuracy in the context of a furnisher's obligations under § 1681s-2(b), it has elucidated the standard for "accuracy" in the context of credit reporting agencies' obligations under 1681e(b) and § 1681i.  The Court has explained that "[a] report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse[]' effect." Schweitzer v. Equifax Information

Solutions LLC, 441 Fed. Appx. 896, 902 (3d Cir. 2011) (quoting

Dalton v. Capital Associated Indus. Inc., 257 F.3d 409, 415 (4th

Cir. 2001) (alterations in original).  As we have opined, the

FCRA requires "congruence between the legal status of a

consumer's account and the status a CRA reports." Crane v.

Trans Union, LLC, 282 F. Supp. 2d 311, 318 (E.D. Pa. 2003)

(relying on Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d

Cir. 1997).  Another Court in this District has noted that the

FCRA imposes more onerous obligations on credit reporting

agencies than it does on furnishers, Farren, at *7, but the

standard for accuracy our Court of Appeals has developed is

nevertheless a useful guide in this case.

        Temple concedes that in response to the August 2011

dispute it made changes that it had not made in response to the

May 2011 dispute.  The only change it made regarding the items

Seamans complains of –- the account status, date of first

delinquency, and payment history –- was to change the account

status from "Current: Paid or Paying as Agreed" to "Closed."

Def.'s MSJ, UMF ¶¶ 16, 21.  The difference between Temple's

response to the May 2011 dispute and the August 2011 dispute

does not suggest that Temple is liable for failure to accurately

report information in May 2011.  Both reports comply with this

standard of accuracy.  Neither report was "patently incorrect". The May 2011 report accurately identified the account status as paid.  Furthermore, Seamans has not alleged that the difference between the account status of "Current, Paid or Paying as Agreed" and the account status of "Closed" had an adverse effect on his credit score.  The damage to his credit score of which Seamans complains instead stems from the very "reporting of the Temple University account," Pl.'s Resp. 15, and not from a descriptive detail about the account status.  The fact that Seamans complains of an identical injury after Temple changed the account status to "Closed" as he complained of when Temple reported the account status as "Current, Paid or Paying as Agreed" confirms our interpretation.  Pl.'s Resp. CSMF 15.

       Finally, as we discuss above, Seamans sought the revisions because he believed -- erroneously -- that this would lead to the removal of the trade line from his credit report. Because the HEA exempts this loan from the limitations period of § 1681c(a)(4), the omission of this information would not undermine the congruence between the legal status of the account and the information in the report.[5]

_____

       [5] The other omission of which Seamans complains -- the failure to include the date of first delinquency - is a

We therefore hold that Temple's investigation was reasonable as a matter of law and that Temple complied with § 1681s-2(b).

### H.   Temple's Failure To Mark
###       The Trade Line As Disputed

Lastly, Seamans also complains that Temple failed to mark the account as disputed.  See Pl.'s Resp. CSMF ¶ 33 ("Temple . . . failed to report that the account was disputed in the compliance condition code field when responding to both the TransUnion and Equifax disputes.").  Though § 1681s-2(b) does not explicitly require a furnisher to provide notice of a dispute, § 1681s-2(a)(3) does require furnishers to provide such notice.  Our Court of Appeals has not opined on whether omitting this information gives rise to liability under § 1681s-2(b). Several Courts of Appeals have found that a furnisher may be liable under the civil penalty provisions of the FCRA for failing to note that an account is disputed, if the dispute is bona fide.

In Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008), the Fourth Circuit held that a furnisher may be liable for failing to include in the report

---

violation of § 1681s-2(a), which, as we have stated repeatedly, does not give rise to a private cause of action.

that the debt was disputed if the omission "was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect." Saunders at 150 (quoting Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001)).  In Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147 (9th Cir. 2009), the Ninth Circuit invoked the reasoning in Saunders and concluded that failure to notify a credit reporting agency of a dispute could give rise to civil liability, but it clarified that "a furnisher does not report 'incomplete or inaccurate' information within the meaning of § 1681s-2(b) simply by failing to report a meritless dispute." Gorman, at 1163.  Rather, "[i]t is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)." Id. Courts in this District have followed Gorman's approach.  See, e.g., Van Veen v. Equifax Information, 844 F. Supp. 2d 599, 606 (E.D. Pa. 2012) (Diamond, J.) (a furnisher may be held liable for failing to report a debt as disputed if the Plaintiff has lodged a bona fide dispute).

Temple concedes that a failure to mark a consumer report as disputed may give rise to liability under the precedent of Gorman and Van Veen, but it contends that Seamans's

36

dispute was not _bona_ _fide_ and so Temple had no obligation to report it.  Def.'s MSJ 21 ("Plaintiff's disputes attempting to have both the trade line and adverse history deleted from the consumer report are frivolous and contrary to existing law. Temple has no obligation to have an account marked 'disputed' following unmeritorious disputes.").

Saunders, Gorman, and Van Veen persuade us that Temple is not liable for failing to report plaintiff's dispute. Because this dispute was not _bona_ _fide_ given the status of the 1989 loan under the HEA, the dispute was (and is) frivolous.

For the foregoing reasons, we will grant defendant's summary judgment motion.


BY THE COURT:


/S/ STEWART DALZELL, J.